No. 99-455

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 312

302 Mont. 452

15 P.3d 1189

DAVID BUTLER,

Plaintiff and Appellant,

v.

DAVID J. DOMIN, M.D., d/b/a, DAVID J. DOMIN, M.D., P.C.;

DONALD EHRLICH, M.D.; and ST. PATRICK HOSPITAL;

and DOES I-IV,

Defendants and Respondents.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable John S. Henson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

John E. Seidlitz, Jr., Seidlitz Law Office, Great Falls, Montana

James P. O'Brien, O'Brien Law Offices, Missoula, Montana

For Respondents:

Jeremy G. Thane, Worden, Thane & Haynes, P.C., Missoula, Montana

Anita Harper Poe, Garlington, Lohn & Robinson, PLLP,

Missoula, Montana

Dana L. Christensen, Christensen, Moore, Cockrell & Cummings, P.C.,

Kalispell, Montana

Submitted on Briefs: March 2, 2000

Decided: December 7, 2000

Filed:

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

¶1 David Butler appeals from the Opinion and Order entered by the Fourth Judicial District Court, Missoula County, granting summary judgment in favor of the Defendants. We affirm in part, reverse in part, and remand.

¶2 Butler's appeal raises the following issues:

¶3 1. Whether the District Court erred when it excluded expert testimony on the basis that it did not meet the standard of admissibility?

¶4 2. Whether the District Court erred when it granted summary judgment in favor of Drs. Ehrlich and Domin?

¶5 3. Whether the District Court erred when it concluded that the doctrine of *res ipsa loquitur* was not applicable?

¶6 4. Whether the District Court erred when it granted summary judgment in favor of St. Patrick Hospital?

# BACKGROUND

¶7 David Butler was examined by Dr. Pat Frankl on November 4, 1992, for severe low back pain. Dr. Frankl referred Butler to Dr. Douglas Woolley in Missoula, Montana, for a same-day appointment due to the suddenness and severity of the pain. Based upon the findings of his examination, Dr. Woolley ordered an injection of a local anesthetic and steroid medication into the epidural space of Butler's spine, near the symptomatic area, to be performed at St. Patrick Hospital. On November 5, 1992, Butler reported to St. Patrick Hospital. Dr. Donald Ehrlich, an anesthesiologist, administered an injection in Butler's back at the L4-5 epidural space. On November 30, 1992, Butler was admitted to St. Patrick Hospital for a second epidural steroid injection. Dr. David J. Domin, also an anesthesiologist, administered this injection at Butler's L3-4 epidural space.

¶8 A biopsy of the disc space performed in February 1993 revealed the presence of Propionibacterium acnes (hereinafter "P. acnes"). Dr. Woolley referred Butler to Dr. L. F. Whitney, an infectious disease specialist. Following an examination and review of Butler's records and test results, Dr. Whitney diagnosed Butler as suffering from probable diskitis, an infection of the disc at the L5-S1 disc space, and osteomyelitis, an infection of the adjacent the L5 vertebral body.

¶9 On October 3, 1996, Butler filed a medical malpractice action against Dr. Ehrlich, Dr. Domin, and St. Patrick Hospital alleging that each of the Defendants was negligent in breaching the standard of care and causing his infection by failing to provide a sterile field prior to performing the epidural steroid injections. After a period of discovery conducted by the parties, each of the Defendants filed motions for summary judgment. Following a hearing on the motions, the District Court issued an Opinion and Order awarding summary judgment in favor of the Defendants. Butler appeals.

# ISSUE ONE

¶10 Whether the District Court erred when it excluded expert testimony on the basis that it did not meet the standard of admissibility?

¶11 The District Court concluded that the testimony of Butler's medical expert, Dr. Paul Blaylock, did not meet the necessary standard of admissibility because "while Dr. Blaylock opined that the epidural injections were more likely to have caused the infection than a blood-borne cause, he was unable to say that one epidural injection was more likely

than not to have caused Plaintiff's infection."

¶12 Butler contends that Dr. Blaylock testified that the epidural injection performed by Dr. Ehrlich more likely than not caused his infection. Drs. Domin and Ehrlich contend that Dr. Blaylock was unable to say which epidural steroid injection more likely than not caused Butler's infection. They claim that the District Court properly excluded Dr. Blaylock's testimony on the basis that it did not meet the minimum standard of reliability required for such testimony to be presented to a jury.

¶13 A district court's decision to exclude expert testimony is a discretionary ruling which we review to determine whether the trial court abused its discretion. *Federated Mut. Ins. Co. v. Anderson*, 1999 MT 288, ¶ 71, 297 Mont. 33, ¶ 71, 991 P.2d 915, ¶ 71. Rule 702, M. R.Evid., provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." In *Dallas v. Burlington Northern, Inc.* (1984), 212 Mont. 514, 689 P.2d 273, we clarified the evidentiary standard required for the admissibility of medical opinions. We stated that a medical expert's opinion is admissible if it is based on an opinion that it is "more likely than not." *Dallas*, 212 Mont. at 523, 689 P.2d at 277.

¶14 Dr. Blaylock's testimony certainly cannot be touted as a model of clarity. We appreciate the frustration of the District Court in trying to sort out exactly what Dr. Blaylock was trying to say. No doubt Dr. Blaylock was attempting to perform the impossible task of including both Drs. Domin and Ehrlich as culpable parties by his testimony, however, the upshot was a confusing presentation. After carefully examining Dr. Blaylock's deposition, however, we reach the following conclusions with respect to the District Court's order.

¶15 The District Court did not abuse its discretion by excluding Dr. Blaylock's testimony with regard to whether Dr. Domin's injection caused Butler's infection. Dr. Blaylock's testimony regarding Dr. Domin does not meet the "more likely than not" standard. To summarize, Dr. Blaylock testified in his deposition that the epidural injections more likely than not caused Butler's infection. With regard to Dr. Domin's conduct, however, Dr. Blaylock testified that his injection "could have" caused Butler's infection. Could have indicates that it is possible that Dr. Domin's injection caused Butler's infection. Could have does not indicate that it was "more likely than not."

¶16 After scrutinizing the deposition, however, we conclude that the District Court abused its discretion in excluding the testimony of Dr. Blaylock with regard to whether Dr. Ehrlich's injection caused Butler's infection. Dr. Blaylock testified as follows:

A. [Blaylock] We have got two anesthesiologist[s] who equally could have caused this infection because of the circumstances, the location, and the time, and all of the other facts in this case and the organism pointing to the cause.

If I had to cho[o]se between one or the other-as I answered it very specifically-purely based on the location of the needle and not based on really anything else, other than the location of the needle and Dr. Ehrlich's testimony that he spent less than the [sic] minute in prepping the back, in my opinion it's more probable than not that his injection was the more likely cause of this seeding.

Q. [Counsel for Dr. Domin] Okay. And I expect that you understand this, but let me just clarify it a little more. In Montana the standard for giving an expert opinion in a medical malpractice case of a medical opinion is more probable than not, which is greater than 50 percent. Is it your opinion that it is more probable that [sic] not that Dr. Ehrlich's epidural steroid injection caused this infection?

A. Yes.

¶17 Dr. Blaylock testified that in his opinion Dr. Ehrlich's injection more likely than not caused Butler's infection and he testified as to the basis for his opinion. Although Dr. Blaylock attempted to implicate both doctors by stating that they both "could have" caused the infection, he limited his testimony by stating that it was "more probable than not" that Dr. Ehrlich's injection caused Butler's infection. This testimony should have been admitted.

## ISSUE TWO

¶18 Whether the District Court erred when it granted summary judgment in favor of Drs. Ehrlich and Domin?

¶19 Our standard of review in appeals from summary judgment rulings is de novo. *Motaire v. Northern Mont. Joint Refuse Disposal Dist.* (1995), 274 Mont. 239, 242, 907 P.2d 154, 156. When we review a district court's grant of summary judgment, we apply

the same evaluation as the district court based on Rule 56, M.R.Civ.P. *Bruner v. Yellowstone County* (1995), 272 Mont. 261, 264, 900 P.2d 901, 903. In *Bruner*, we set forth our inquiry:

> The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. We review the legal determinations made by a district court as to whether the court erred.

*Bruner, 272 Mont. at 264-65, 900 P.2d at 903 (citations omitted).*

¶20 In a summary judgment proceeding, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences will be drawn in favor of the party opposing summary judgment. *Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 22, 297 Mont. 336, ¶ 22, 993 P.2d 11, ¶ 22. Consequently, we will view the evidence in the light most favorable to Butler and draw all reasonable inferences in his favor.

¶21 In order to survive a motion for summary judgment in a negligence action, a plaintiff must raise genuine issues of material fact with regard to a legal duty on the part of the defendant, a breach of that duty, causation, and damages. *See Lopez v. Great Falls Pre-Release Services, Inc.*, 1999 MT 199, ¶ 18, 295 Mont. 416, ¶ 18, 986 P.2d 1081, ¶ 18. In a cause of action alleging medical malpractice, a plaintiff usually must produce "expert medical testimony regarding [the applicable] standard of care and departure from that standard." *Estate of Nielsen v. Pardis* (1994), 265 Mont. 470, 473, 878 P.2d 234, 235-36. *But see Dalton v. Kalispell Regional Hosp.* (1993), 256 Mont. 243, 246, 846 P.2d 960, 961-62 (discussing common knowledge exception to expert medical testimony requirement when "conduct complained of is readily ascertainable by a lay person").

### A. Dr. Domin

¶22 We conclude that the District Court correctly granted summary judgment in favor of Dr. Domin. Butler has produced no evidence that would tend to indicate that the injection performed by Dr. Domin caused his infection. The only expert evidence Butler submitted with regard to Dr. Domin's conduct, Dr. Blaylock's testimony, indicates that it is unlikely that the injection performed by Dr. Domin caused his infection. Dr. Blaylock testified that

although Dr. Domin's injection "could have" caused Butler's infection, it was more likely than not that Dr. Ehrlich's injection was the cause.

### B. Dr. Ehrlich

¶23 We conclude that the District Court erroneously granted summary judgment in favor of Dr. Ehrlich. When viewed in a light most favorable to Butler, Dr. Blaylock's expert medical testimony raises genuine issues of material fact with regard to Dr. Ehrlich's duty of care in performing the epidural injection, a breach of that duty, and causation. On the standard of care, Dr. Blaylock testified that the standard skin preparation for an epidural or spinal tap procedure takes five minutes. Regarding breach, Dr. Blaylock testified that it was "Dr. Ehrlich's testimony that he spent less than [a] minute in prepping [Butler's] back." Dr. Ehrlich did in fact testify that "[i]t might take a minute or two" to complete the skin preparation. Finally, as to the issue of causation, Dr. Blaylock testified that he was confident that P. acnes was the cause of Butler's diskitis and osteomyelitis. He based this opinion on the fact that Dr. Whitney isolated P. acnes from Butler's biopsy and Butler's infection resolved after Butler took antibiotics to which P. acnes has a known sensitivity. Dr. Blaylock testified that P. acnes is a known skin contaminant which can be removed given a reasonable skin preparation. Dr. Blaylock further testified that given the location of the injection and Dr. Ehrlich's skin preparation, "it's more probable than not that his injection was the more likely cause of this seeding." Consequently, we reverse the District Court's grant of summary judgment in favor of Dr. Ehrlich.

### ISSUE THREE

¶24 Whether the District Court erred when it concluded that the doctrine of *res ipsa loquitur* was inapplicable?

¶25 Butler also contends that the District Court erred when it concluded that the doctrine of *res ipsa loquitur* did not apply to these facts. However, because we have decided that Butler has raised genuine issues of material fact sufficient to preclude summary judgment, we need not decide the applicability of *res ipsa loquitur* at this time.

### ISSUE FOUR

¶26 Whether the District Court erred when it granted summary judgment in favor of St. Patrick Hospital?

¶27 The District Court concluded that St. Patrick Hospital was entitled to summary judgment on Butler's actual and ostensible agency claims. Generally, a hospital is not vicariously liable for the negligent acts of physicians operating as independent contractors. *See, e.g., Estates of Milliron v. Franke* (1990), 243 Mont 200, 204, 773 P.2d 824, 827. However, a hospital is responsible as a principal to third persons for the negligent acts of its actual or ostensible agents acting within the scope of their agency. Section 28-10-602, MCA. As previously noted, our standard of review in appeals from summary judgment rulings is de novo. *Motaire*, 274 Mont. at 242, 907 P.2d at 156.

### A. Actual Agency

¶28 "[A] principal is responsible to third persons for the negligence of [its] agents in the transaction of the business of the agency." Section 28-10-602(1), MCA. Actual agents are statutorily defined as persons who are "really employed by the principal." Section 28-10-103, MCA. Accordingly, summary judgment in favor of St. Patrick Hospital on the issue of actual agency was proper if Butler failed to raise genuine issues of material fact as to whether Dr. Ehrlich was "really employed" by St. Patrick Hospital.

¶29 An individual is an employee of another when that other has the right to control the details, methods, or means of accomplishing the individual's work. *Fandrich v. Capital Ford Lincoln Mercury* (1995), 272 Mont. 425, 430, 901 P.2d 112, 115. *See also American Agrijusters Co. v. Montana Dep't of Labor and Indus.,* 1999 MT 241, ¶ 21, 296 Mont. 176, ¶ 21, 988 P.2d 782, ¶ 21 (discussing the definition of "independent contractor" pursuant to § 39-51-201(14), MCA). In determining whether a right of control exists sufficient to give rise to an employer-employee relationship in a given situation, we have identified four factors that guide the inquiry: (1) direct evidence of right or exercise of control; (2) method of payment; (3) furnishing of equipment; and (4) right to fire. *American Agrijusters*, ¶ 21.

¶30 In *Kober v. Stewart* (1966), 148 Mont 117, 417 P.2d 476, we addressed the vicarious liability of a hospital under a theory of actual agency. Appellants contended that Billings Deaconess Hospital was vicariously liable for the negligence of a radiologist. Although not specifically applying the four-factor test for determining whether an employer-employee relationship existed, the facts which we found relevant indicate that our decision was motivated by similar considerations. For example, with regard to evidence of the hospital's right to control or exercise of control, we observed that neither the patient nor the patient's doctor requested a specific radiologist, but rather that the radiologist who

treated the patient was "on call" and it was "standard procedure" for the hospital to choose a radiologist to read x-ray films. *Kober*, 148 Mont. at 123, 417 P.2d at 479. We also noted that the contract between the hospital and the radiologist never specified that the radiologist was an independent contractor. With regard to the method of payment and the furnishing of equipment, we noted that the hospital operated the x-ray department, employed the technicians, owned the space and the equipment, charged the patients for the services, and shared the income generated by the radiology department. As a result of this evidence, we held that the plaintiffs had raised a genuine issue of material fact concerning whether the radiologist was an actual agent of the hospital. *Kober*, 148 Mont. at 124, 417 P.2d at 480.

¶31 As in *Kober*, Butler did not choose the physician who performed the challenged procedure. Rather, Dr. Ehrlich was chosen through St. Patrick Hospital's anesthesiologist scheduling secretary. On the other hand, Glen McFaden, the Director of Surgical Services at St. Patrick Hospital, testified that the anesthesiologists are independent contractors; they do not have individual offices within the hospital; they determine their own charges for their services; they handle their own billing independently and do not share their income with St. Patrick Hospital; and they own the anesthesia machines used in the surgical department. In regard to the choice and scheduling of the anesthesiologist, McFaden testified that the anesthesiologists inform the hospital's scheduling secretary of their availability to provide services and the scheduling secretary then informs physicians of the availability of individual anaesthesiologists. McFaden claimed that this system serves to insure the availability of anesthesiology services in operating rooms and provides a fair and impartial method for the selection of an anesthesiologist by the treating physician.

¶32 We conclude that Butler has failed to raise a genuine issue of material fact as to whether Dr. Ehrlich was an actual agent of St. Patrick Hospital. Butler's claim of actual agency is based entirely on the fact that he did not chose Dr. Ehrlich, but rather that Dr. Ehrlich was designated to perform the procedure by St. Patrick Hospital's anesthesiologist scheduling system. Even when viewed in a light most favorable to Butler, however, it is not reasonable to infer solely from the existence of this scheduling system that St. Patrick Hospital had the right to control or exercised control over the details, methods, or means of accomplishing Dr. Ehrlich's work. The only reasonable inference we draw from the existence of this scheduling system is that St. Patrick Hospital facilitated Butler's referral by insuring that an anesthesiologist was available at the time he chose to undergo the epidural injections.

## B. Ostensible Agency

¶33 A putative principal may also be held liable for the acts of its ostensible agents. *See* § 28-10-602, MCA. Section 28-10-103, MCA, provides in relevant part:

> An agency is ostensible when the [putative] principal intentionally or by want of ordinary care causes a third person to believe another to be [the putative principal's] agent who is not really employed by [it].

¶34 Pursuant to the statutory definition of ostensible agency, summary judgment in favor of St. Patrick Hospital was proper if Butler failed to raise genuine issues of material fact as to whether St. Patrick Hospital intentionally or negligently led Butler to reasonably believe that Dr. Ehrlich was its employee. *See Sunset Point Partnership v. Stuc-O-Flex Intern., Inc*., 1998 MT 42, ¶ 22, 287 Mont. 388, ¶ 22, 954 P.2d 1156, ¶ 22.

¶35 Butler argues that the following facts establish that St. Patrick Hospital intentionally or negligently caused him to reasonably believe that Dr. Ehrlich was its agent: St. Patrick Hospital did not notify him that Dr. Ehrlich was a physician in private practice and not associated with the hospital; at no time did Dr. Ehrlich indicate that he was not an employee of the hospital; and the hospital did not offer Butler a choice of anesthesiologists nor did Butler actually choose Dr. Ehrlich.

¶36 We have had only one other opportunity to discuss the applicability of ostensible agency in the context of a hospital/physician relationship. In *Estates of Milliron v. Franke* (1990), 243 Mont. 200, 793 P.2d 824, the plaintiff, Alfred Milliron, was referred by his treating physician to Dr. Francke, a radiologist at the Roundup Memorial Hospital, for an evaluation of prostatitis and obstructive uropathy by using a special x-ray procedure. We held that the following facts were insufficient to preclude summary judgment in favor of the hospital on the issue of ostensible agency: the hospital had agreed to provide adequate space, equipment, and personnel for the radiology department, sent and collected bills on behalf of the radiologist, and provided the radiologist with an office at the hospital. *Milliron,* 243 Mont. at 203, 793 P.2d at 826-27. We noted that providing adequate space, equipment, and personnel is nothing more than what a hospital provides other doctors for the treatment of their patients. *Milliron*, 243 Mont. at 204, 793 P.2d at 827. We held that the hospital was entitled to summary judgment because the facts relied upon by the plaintiffs did not raise a genuine issue of material fact as to whether the hospital intentionally or negligently led the patient to believe the radiologist was the hospital's

agent. *Milliron,* 243 Mont. at 203, 793 P.2d at 827.

¶37 We do not believe that our holding in *Milliron* is dispositive of the issue of ostensible agency in this case. Butler's circumstances are factually distinct from the circumstances at issue in *Milliron*. Unlike *Milliron,* Butler testified that neither he nor his treating physician chose either Dr. Domin or Dr. Ehrlich for treatment. Both doctors were selected and scheduled by St. Patrick Hospital. Dr. Woolley simply referred Butler to St. Patrick's for the epidural injections and not to a specific physician. Butler also testified that upon arrival St. Patrick's did not inform him that Dr. Ehrlich was an independent contractor. These contentions raise genuine issues of material fact as to whether St. Patrick intentionally or negligently caused Butler to reasonably believe that Dr. Ehrlich was its employee.

¶38 Courts in other jurisdictions have concluded that hospitals may be held liable for the negligent acts of independent physicians under a theory of ostensible or apparent agency. *See generally*, John D. Hodson, Annotation, *Liability of Hospital or Sanitarium for Negligence of Physician or Surgeon*, 51 A.L.R. 4th 235 (1987). These courts have held that a hospital may be liable if the hospital holds itself out as a provider of medical services and, in the absence of notice or knowledge to the contrary, the patient looks to the hospital, as opposed to the independent practitioner, to provide competent medical care. *See Simmons v. Tuomey Reg'l Med. Ctr.* (S.C. 2000), 533 S.E.2d 312, 322; *Sword v. NKC Hosp., Inc.* (Ind. 1999), 714 N.E.2d 142, 152; *Clark v. Southview Hosp. & Family Health Ctr.* (Ohio 1994), 628 N.E.2d 46, 53. Generally, these decisions have relied upon Restatement (Second) of Torts § 429[1], and Restatement (Second) of Agency § 267[2]. *See Simmons*, 533 S.E.2d at 322 (adopting § 429); *Sword*, 714 N.E.2d at 152 (adopting § 429); *Clark*, 628 N.E.2d at 52-53 (discussing both § 429 and § 267).

¶39 Although in *Milliron* we declined to adopt Restatement (Second) of Torts § 429, we find decisions interpreting this provision particularly relevant because they address the same issues underlying § 28-10-103, MCA. Decisions interpreting both the Restatement provisions and our ostensible agency statute focus on the action or inaction of the putative principal which caused the third person to believe an employment relationship existed, and the reasonableness of the third person's corresponding belief. *Compare Sunset Point Partnership*, ¶ 23-24 (affirming summary judgment in favor of putative principal because the plaintiff did not point to any acts by the putative principal which could have led the plaintiff to reasonably believe that an agency relationship existed), *with Simmons*, 533 N.E.2d at 322 ("Under section 429, the plaintiff must show that (1) the hospital held itself

out to the public by offering to provide services; (2) the plaintiff looked to the hospital, rather than the individual physician, for care; and (3) a person in similar circumstances reasonably would have believed that the physician who treated him or her was a hospital employee.)

¶40 The Supreme Court of Indiana recently undertook an extensive survey of the vicarious liability of hospitals under theories of apparent or ostensible agency in *Sword v. NKC Hospitals, Inc.* (Ind. 1999), 714 N.E.2d 142. The Court concluded that "a hospital will be deemed to have held itself out as the provider of care unless it gives notice to the patient that it is not the provider of care and that the care is provided by a physician who is an independent contractor and not subject to the control and supervision of the hospital." *Sword*, 714 N.E.2d at 152. The Court stated, that absent any meaningful notice to the contrary, it is reasonable for a patient to believe that a physician is a hospital employee if the patient has no special knowledge regarding the arrangement the hospital has made with its physicians, and if there is no reason that the patient should have known of these employment relationships. *See Sword*, 714 N.E.2d at 152.

¶41 We agree with the reasoning of *Sword*. As noted by commentators:

> [T]he hospital itself has come to be perceived as the provider of medical services. According to this view, patients come to the hospital to be cured, and the doctors who practice there are the hospital's instrumentalities, regardless of the nature of the private arrangements between the hospital and the phsysican. . . . [T]hese changes in public perception can be ascribed in large part, in the view of the authors, to the health service industry's re-invention of the hospital as the center for comprehensive health care delivery.

Martin C. McWilliams, Jr. & Hamilton E. Russell, III, *Hospital Liability for Torts of Independent Contractor Physicians,* 47 S.C.L. Rev. 431, 473 (1996). *See also Clark*, 628 N.E.2d at 53 (stating that "[p]ublic policy dictates that the public has every right to assume and expect that the hospital is the medical provider that it purports to be").

¶42 The facts of *Sword* are remarkably similar to the facts of the case now before us. In *Sword*, the Supreme Court of Indiana found three facts to be of particular relevance. First, the Court noted that the record did not contain any evidence which would have indicated that the hospital did anything to put the patient on notice that her physician, an independent contractor, and not the hospital, was responsible for her medical care. Second,

the Court observed that the patient did not select her own anesthesiologist prior to admission and the record did not contain any other evidence which would have indicated that the patient had any special knowledge with regard to the hospital's employment arrangements. Third, the Court noted that the hospital held itself out as a full service hospital. On the basis of these facts, the Court reversed the trial court's award of summary judgment in favor of the hospital. *Sword,* 714 N.E.2d at 152-53.

¶43 We conclude that the District Court erred when it granted summary judgment in favor of St. Patrick Hospital. Butler's testimony that he did not receive notice of the employment relationship between Dr. Ehrlich and St. Patrick Hospital is sufficient to raise a genuine issue of material fact as to whether St. Patrick Hospital intentionally or negligently caused Butler to believe that Dr. Ehrlich was its agent. Furthermore, it is not apparent from the record that Butler had any knowledge which would indicate that he did not in fact believe that Dr. Ehrlich was St. Patrick Hospital's employee. As in *Sword,* Butler contends that neither he nor his private physician selected Dr. Ehrlich to perform the epidural injection. *See Sword*, 714 N.E.2d at 152-53. Therefore, the District Court's award of summary judgment on behalf of St. Patrick Hospital is hereby reversed.

¶44 Affirmed in part, reversed in part, and remanded.

/S/ JIM REGNIER

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART

/S/ JAMES C. NELSON

/S/ TERRY N. TRIEWEILER

/S/ KARLA M. GRAY

1. Restatement (Second) of Torts § 429 (1965) provides, "One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being

rendered by the employer or by [the employer's] servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them . . . ."

2. Restatement (Second) of Agency § 267 (1958) provides, "One who represents that another is [that person's] servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent . . . ."